**FILED**

**November 4, 2016**

**IN COURT OF WORKERS' COMPENSATION CLAIMS**

**Time 1:21 PM**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# IN THE COURT OF WORKERS' COMPENSATION CLAIMS
# AT CHATTANOOGA

| | | |
|---|---|---|
| Lamar Ringer,<br>　　　Employee, | ) | Docket No.: 2015-01-0149 |
| v. | ) | State File Number: 94491-2014 |
| Welding Ceramics, Inc.<br>　　　Employer, | ) | Judge Thomas Wyatt |
| v. | ) | |
| Technology Assigned Risk/<br>Amtrust North America,<br>　　　Insurance Carrier. | ) | |

---

## COMPENSATION HEARING ORDER AWARDING PERMANENT PARTIAL DISABILITY BENEFITS

---

This case came before the undersigned Workers' Compensation Judge on October 19, 2016, for a Compensation Hearing pursuant to Tennessee Code Annotated section 50-6-239 (2015). The central issues raised by the parties were: (1) the extent of permanent partial disability benefits to which the employee, Lamar Ringer, is entitled;[1] (2) whether Mr. Ringer is entitled to additional temporary disability benefits; and (3) whether Mr. Ringer is entitled to a panel from which to select a new authorized treating physician. For the reasons set forth below, the Court holds Mr. Ringer established entitlement to permanent partial disability benefits, but did not establish his entitlement to the requested temporary disability benefits and new panel.[2]

---

[1]Pertinent to the decision of this issue is a determination of (1) whether Mr. Ringer introduced sufficient evidence to rebut the statutory presumption of correctness afforded the impairment rating of the authorized treating physician and (2) whether Mr. Ringer acted reasonably in failing to return to work following his injury.

[2]The Court attached a complete list of the technical record and exhibits admitted into evidence at the Compensation Hearing as an appendix to this Order.

1

## History of Claim

Mr. Ringer is a fifty-two-year-old resident of Chattanooga, Hamilton County, Tennessee who, on the date of injury, had worked approximately three years as a press operator for Welding Ceramics, Inc. (WCI). (Ex. 1 at 1, 2.) During the year before his injury, Mr. Ringer earned wages sufficient to establish an average weekly wage of $390.29.[3] (T.R. 3 at 2; Ex. 6.)

Mr. Ringer testified his job required him to regularly pour a sand-like solution from a garbage can into a hopper on his press that was located above his head. On November 19, 2014, he lifted a can of solution to pour it into his press and, as he did so, he struck a moving part of the press with the can. This impact knocked the can from Mr. Ringer's grasp and suddenly jerked his body backward. Mr. Ringer immediately experienced pain in his neck with a throbbing sensation into his left shoulder and arm. He reported his injury the day it occurred, and WCI accepted the claim as compensable. (Ex. 7; T.R. 3 at 2.)

Mr. Ringer testified he received authorized physical therapy for his injury at Nova Medical and, later, underwent an MRI of his cervical spine. He ultimately received a panel for specialty care and selected orthopedic surgeon Dr. Jay E. Jolley, II as his authorized treating physician. (Ex. 3.)

Dr. Jolley performed a clinical examination at the initial visit on March 2, 2015, and testified by deposition that he verified mild weakness and decreased tendon reflex in Mr. Ringer's left biceps. (Ex. 5 at 9-10.) Dr. Jolley reviewed Mr. Ringer's MRI, diagnosed a large C5/C6 disc herniation that compressed the spinal cord, and recommended immediate surgery to "hopefully cut off any neurologic . . . compromise or catastrophe down the road." *Id.* at 7-8, 10. He restricted Mr. Ringer's activities to no lifting greater than eight pounds, no sweeping or packing, and performance of duties allowing him to frequently change positions. *Id.* at 13.

Mr. Ringer declined the recommended surgery because he feared the potential complications associated with it. (Ex. 5 at 15, 20-21.) He testified he was frightened that the recommended surgery required an incision through the throat and the surgeon had to "split your face" and move the voice box to perform the surgery.

Except for two short periods during which WCI paid him temporary disability benefits (T.R. 3 at 2), Mr. Ringer worked light duty at WCI while under Dr. Jolley's restrictions. *Id.* at 12-13. Mr. Ringer testified that even the diminished lifting he performed while on light duty hurt his neck, left shoulder, and left arm.

---

[3] Mr. Ringer's compensation rate is, thus, $260.16 per week.

2

After several follow-up office visits, Dr. Jolley referred Mr. Ringer for a Functional Capacity Evaluation (FCE), which Mr. Ringer underwent on August 27. (Ex. 5 at ex. 5, p. 1.) The FCE examiner recommended against the placement of permanent restrictions on Mr. Ringer's activities. *Id.* at ex. 5, p. 1.[4] On September 14, Dr. Jolley placed Mr. Ringer at maximum medical improvement, rated his impairment at six percent to the whole body, and released him to return to regular duty. *Id.* at 18-20, 23-24. Dr. Jolley testified he did not place restrictions on Mr. Ringer's activities because "looking at the conclusion that the [FCE] examiner came up with there was---no restrictions were recommended. So ultimately, he was deemed to be capable of his regular duty." *Id.* at 18.

WCI reassigned Mr. Ringer to his regular job upon receiving Dr. Jolley's release. Mr. Ringer twice attempted to work, but on both occasions developed sufficiently severe neck, left shoulder, and left arm pain that he stopped work after a few hours and sought emergency care. After the second occasion, he left work in pain. His supervisor, Richard Durham, told Mr. Ringer he could not work him so long as he continued to leave during his shift. WCI's human resources department recommended Mr. Ringer take time off under the Family and Medical Leave Act (FMLA). Mr. Ringer applied for FMLA leave and received it.

On September 18, Mr. Ringer saw a Physician's Assistant in Dr. Jolley's office and reported that he experienced pain requiring emergency care when he attempted to return to his regular job at WCI. (Ex. 5 at ex. 4, p. 3.) The Physician's Assistant noted Mr. Ringer voiced frustration about Dr. Jolley returning him to work without restrictions and explained that Dr. Jolley did not assign restrictions because of the FCE findings. *Id.* She also noted that Mr. Ringer stated he would sue Dr. Jolley if he hurt himself at work. *Id.*

Mr. Ringer testified he did not attempt to return to work at WCI at the end of his twelve weeks of FMLA leave because he knew the continuing pain from his work injury would disable him from performing his press operator job. He stated he presently suffers pain daily and has not attempted to return to work anywhere because of this pain. He lives with his mother and receives food stamps.

Mr. Ringer has not returned to Dr. Jolley's office since September 2015, but has used private insurance to pay for pain management, including prescribed narcotic medication, for his work injury. Dr. Jolley testified he remains willing to provide Mr. Ringer's future treatment, but stated the only options he will consider are the

---

[4] During his deposition, Dr. Jolley testified that the FCE examiner found that Mr. Ringer gave submaximal effort during the FCE and recommended against permanently restricting Mr. Ringer's activities because the FCE findings were "unreliable." (Ex. 5 at 18.)

3

recommended surgery or watching Mr. Ringer's injury to see if more severe neurological deficits develop. *Id.* at 20, 25. Dr. Jolley testified he would not recommend pain management for Mr. Ringer because the prescription of narcotic medication is "a horrible way" to treat chronic pain. *Id.* at 19, 22. During the Compensation Hearing, Mr. Ringer requested authorization to see another panel physician for consideration of alternative treatment modalities for his injury, including surgical options that do not involve surgical entry through his throat.[5]

Dr. Jerry L. Smith, a physical medicine and rehabilitation physician, saw Mr. Ringer on a single occasion and rated his impairment at ten percent to the whole body. (Ex. 2 at 3, 12.) Both Drs. Jolley and Smith rated Mr. Ringer's impairment under the Sixth Edition of the *American Medical Association Guidelines to the Evaluation of Impairment* (*AMA Guides*). (Ex. 2 at 3; Ex. 5 at 4.) Dr. Smith permanently restricted Mr. Ringer from lifting greater than fifteen pounds and from sweeping. (Ex. 2 at 10.) He also permanently restricted Mr. Ringer to jobs that allow him to frequently change positions. *Id.*

## Findings of Fact and Conclusions of Law

### *Applicable Legal Principles*

Mr. Ringer bears the burden of proving all essential elements of his claim. *See Scott v. Integrity Staffing Solutions,* No. 2015-01-0055, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Tenn. Workers' Comp. App. Bd. Aug. 18, 2015). "[A]t a compensation hearing where the injured employee has arrived at a trial on the merits, the employee must establish by a preponderance of the evidence that he or she is, in fact, entitled to the requested benefits." *Willis v. All Staff,* No. 2014-05-0005, 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Tenn. Workers' Comp. App. Bd. Nov. 9, 2015); *see also* Tenn. Code Ann. § 50-6-239(c)(6) (2015). The Court will not construe the law remedially or liberally in Mr. Ringer's favor in assessing his right to benefits, but will construe the law fairly, impartially, and in accordance with basic principles of statutory construction favoring neither party to the claim. *See* Tenn. Code Ann. § 50-6-116 (2015).

### *Permanent Partial Disability Benefits*

### *Initial-Tier Permanent Partial Disability Benefits*

Tennessee law has historically provided monetary benefits to compensate an injured employee for "disability partial in character, but adjudged to be permanent." *See Key v. Briar Hill Collieries,* 68 S.W.2d 115, 116 (Tenn. 1933); Tenn. Code Ann. § 50-6-

---

[5] WCI authorized Mr. Ringer to see Dr. Richard Kern, a neurosurgeon, for a second opinion on surgery. According to the report of Dr. Jerry Smith, Dr. Kern recommended the same surgery as did Dr. Jolley. (Ex. 2 at 9.)

4

207(3)(A) (2012). However, the 2013 reforms to the Tennessee Workers' Compensation Law changed the formula for calculating an employee's permanent partial disability benefits award, enacting a two-tier compensatory system. Tennessee Code Annotated section 50-6-207(3)(A) (2015) provides the following formula for calculating the initial tier of permanent partial disability benefits: "at the time the injured employee reaches maximum medical improvement the injured employee shall be paid sixty-six and two-thirds percent (66 2/3%) of the employee's average weekly wages for the period of compensation, which shall be determined by multiplying the employee's impairment rating by four hundred fifty (450) weeks." The injured employee receives the above-described disability benefit whether he or she "has returned to work or not." *Id.*

WCI does not dispute Mr. Ringer's entitlement to initial-tier permanent partial disability benefits, but argues the Court should base these benefits on Dr. Jolley's impairment rating of six percent to the whole body. (Ex. 5 at 24; Ex. 4 at p. 1.) Mr. Ringer seeks benefits based on Dr. Smith's ten percent whole body rating. (Ex. 2 at 9-10). Because Dr. Jolley is the authorized treating physician, the Workers' Compensation Act presumes the accuracy of his impairment rating subject to rebuttal by a preponderance of the evidence. Tenn. Code Ann. § 50-6-204(k)(7) (2015).

In *Mansell v. Bridgestone Firestone N. Am. Tire,* 417 S.W.3d 393, 410-412 (Tenn. 2013), the Supreme Court discussed the type of evidence a trial court may consider in determining whether a party had rebutted the presumption of accuracy afforded the impairment rating of a physician selected under the Bureau's Medical Impairment Rating Registry.[6] While the Court in *Mansell* did not provide formulaic requirements describing the quality or quantity of evidence necessary to rebut a statutory presumption of accuracy, it did establish that the following factors may be relevant to a judicial determination of the rebuttal issue:

(1) a comparison of the specialties of the physicians providing the ratings;
(2) whether a disagreement between the physicians as to the diagnosis of the employee's condition exists; and
(3) whether a physician employed an incorrect methodology under the *AMA Guides* in formulating his or her impairment rating.

The Court finds that the first two criteria listed above provide no basis for concluding that Mr. Ringer has overcome the statutory presumption of accuracy afforded Dr. Jolley's impairment rating. Both Drs. Jolley and Smith possess sufficient professional credentials to provide admissible impairment ratings. Also, Drs. Jolley and

---

[6] Because the Supreme Court in *Mansell* considered a different presumption than that before the Court in this claim, the Court does not consider that the *Mansell* opinion binds its decision here. However, the Court finds instructive the Supreme Court's discussion in *Mansell* regarding the type of evidence it may consider to rebut a statutory presumption.

Smith reached similar diagnoses of Mr. Ringer's condition. (Ex. 2 at 9; Ex. 5 at 8.)

However, the methodologies the doctors employed in formulating their impairment ratings under the *AMA Guides* do provide a probative factor upon which to assess their competing ratings. When asked during his deposition how he arrived at his impairment rating, Dr. Jolley responded, "[u]sing the [*AMA Guides*], it looks like Page 564, Table 17.2." Dr. Smith also used Table 17-2 of the *Guides* as his beginning point in assessing Mr. Ringer's impairment. (Ex. 2 at 9.) Accordingly, the Court will likewise refer to Table 17-2 in its assessment of the methodologies utilized by Drs. Jolley and Smith in formulating their impairment ratings.

The Court focuses on the "Motion Segment Lesions" section of Table 17-2, on page 564, because that section applies to an intervertebral disk herniation, the diagnosis given Mr. Ringer by both Drs. Jolley and Smith. According to Table 17-2, the first step a physician takes in formulating an impairment rating thereunder is the placement of the patient's impairment in a designated classification.

The separating factor between a Class 1 and a Class 2 impairment under the "Motion Segment Lesions" section of Table 17-2 is the presence or absence of radicular symptoms at the time the physician assesses the impairment. If, at the time of the impairment evaluation, the physician finds the patient has "documented *resolved radiculopathy or nonverifiable radicular complaints at clinically appropriate level[s]*" (emphasis original), associated with his or her herniated disk, the correct classification is impairment Class 1. If, however, the physician examines the patient and finds "documented *residual radiculopathy at the clinically appropriate level*" (emphasis original), associated with the herniated disk, the correct classification is impairment Class 2. *See AMA Guides,* at pp. 564-565. The decision on which impairment classification applies is critical to the physician's impairment rating because Table 17-2 mandates that a physician set a patient's impairment rating between 1% to 8% to the body for a Class 1 impairment, while a Class 2 impairment results in an impairment rating of between 9% to 14% to the body. *Id.* at 564.

The Court questions how Dr. Jolley could place Mr. Ringer's impairment in Class 1 when his own records and deposition testimony establish Mr. Ringer had verifiable radicular findings in his left upper extremity at all times from the date of injury until Dr. Jolley formulated his impairment rating on September 22, 2015. (Ex. 5 at ex. 4, p. 1.) At the initial treatment visit, Dr. Jolley determined that Mr. Ringer had a positive Spurling's test, decreased left C6 sensation to light touch/pinwheel testing, and decreased left deep tendon reflexes. (Ex. 5, ex. 4, p. 17.) Based on these findings, Dr. Jolley recommended cervical spinal surgery to treat Mr. Ringer's work injury "[g]iven the large HNP and severe cord and nerve root compression." *Id.* at ex. 4, p. 17.

While Dr. Jolley did not repeat clinical examinations on Mr. Ringer during follow-

6

up visits,[7] he signed off on a July 27, 2015 examination performed by a nurse practitioner in his office, who found decreased sensation in the C6 distribution in Mr. Ringer's left upper extremity, as well as decreased deep tendon reflexes bilaterally. *Id.* at ex. 4, pp. 9, 11, 13. The same nurse practitioner saw Mr. Ringer on August 26 and again performed a clinical examination. (Ex. 5, at ex. 4, p. 5.) On this exam, she found Mr. Ringer had absent biceps and brachioradialis reflexes, as well as diminished light touch sensation in the C6 distribution, in his left upper extremity. *Id.* at ex. 4, p. 6. On September 18, Mr. Ringer saw a physician's assistant in Dr. Jolley's office who assessed him to have diminished strength and diminished "neurological exams" in the left biceps and diagnosed him with "upper extremity radiculits"[8] and C5-6 HNP with cord compression." *Id.* at ex. 4, pp. 2-3.

Dr. Jolley saw Mr. Ringer on September 14, eight days before he issued his impairment rating report, but did not perform a physical examination. (Ex. 5 at ex. 4, p. 4.). However, he had access in his notes to the findings made by the medical staff in his office that verified Mr. Ringer had left-upper-extremity radicular symptoms during examinations performed within a month of the date Dr. Jolley issued his rating. Also, during his deposition, WCI's attorney asked Dr. Jolley if Mr. Ringer had radiculopathy in his left upper extremity on July 27, 2016, to which Dr. Jolley answered "Yes." (Ex. 5 at 16.)[9]

Despite the above-described multiple documentations of verifiable radicular symptoms associated with Mr. Ringer's neck injury, Dr. Jolley assessed Mr. Ringer with a Class 1 impairment. *Id.* at ex. 4, p. 1. In view of the above, the Court finds no factual support for Dr. Jolley's assessment of a Class 1 impairment, which, according to the *AMA Guides,* requires that the assessing physician find the patient has "resolved radiculopathy or nonverifiable radicular complaints at the clinical appropriate level[s] at the time of examination."

A review of Dr. Smith's report indicates he verified radicular symptoms in Mr. Ringer's left upper extremity at the time he examined him on March 21, 2016. (Ex. 2 at 9.) He noted that Mr. Ringer experienced increased neck pain radiating down his right arm when passively flexed; had decreased sensation to light touch in his left thumb the

---

[7] The Court is concerned that Dr. Jolley rated Mr. Ringer's impairment without personally performing a physical examination at or near the time he assessed the impairment. The *AMA Guides* implies a contemporaneous physical examination as part of the impairment evaluation process when, at page 572, it provides: "When performing a physical examination, the clinician needs to determine the significance of the physical findings *as they relate to the impairment being evaluated.*" (Emphasis added.)

[8] The glossary of the *AMA Guides,* at page 613, defines "radiculitis" as an "[i]nflammation of a nerve root." The glossary goes on to state that, "[a]s commonly used, radiculitis implies symptoms such as pain, numbness, tingling, and/or weakness in the distribution of a nerve root; but without physical findings of radiculopathy."

[9] Dr. Jolley described those radicular symptoms as mild weakness and sensory changes consistent with the aggravation of the C6 nerve root. (Ex. 5 at 16.)

7

distal radial side of his left forearm; and had absent biceps and brachioradialis reflexes in his left arm. *Id.* at 9. Based on the above-described radicular findings, Dr. Smith placed Mr. Ringer's impairment in Class 2.

Based on the protocol of the *AMA Guides* in the evaluation of impairment for a herniated disk in a patient's cervical spine, the Court concludes that Dr. Jolley applied an incorrect methodology by placing Mr. Ringer's impairment in Class 1. Dr. Jolley's own records and deposition testimony establish the presence of verifiable radicular findings in Mr. Ringer's left upper extremity within a month of the date Dr. Jolley issued his rating. Accordingly, the Court gives little weight to Dr. Jolley's impairment rating.

The Court also finds that, upon verifying through clinical testing that Mr. Ringer had left-upper-extremity radicular symptoms at the time he performed his impairment examination, Dr. Smith correctly applied the methodology of the *AMA Guides* by placing Mr. Ringer's impairment in Class 2. For this reason, the Court finds that the preponderance of the evidence rebuts the statutory presumption of correctness afforded Dr. Jolley's rating and the Court thus accepts Dr. Smith's rating of ten percent to the whole body as the rating upon which to assess Mr. Ringer's entitlement to initial-tier permanent partial disability benefits. Based on the above finding, the Court holds Mr. Ringer is entitled to forty-five weeks of initial-tier permanent partial disability benefits at his compensation rate of $260.16.[10] *See* Tenn. Code Ann. § 50-6-207(3)(A) (2015).

*Increased Permanent Partial Disability Benefits*

The Court's inquiry now turns to whether Mr. Ringer is entitled to increased permanent partial disability benefits. Tennessee Code Annotated section 50-6-207(3)(B) (2015) provides additional permanent partial disability benefits to an employee who, at the end of the designated compensation period, has "not returned to work with any employer or has returned to work and is receiving less than one hundred percent (100%) of the wages or salary the employee received from his pre-injury employer on the date of injury." Section 50-6-207(D)(i) (2015) provides, however, that an employee is not entitled to increased permanent partial disability benefits for loss of employment that "is due to the employee's voluntary resignation or retirement provided, however, that the resignation does not result from the work-related disability."

During the Compensation Hearing, Mr. Ringer testified he has not worked at WCI since September 2015 when he twice unsuccessfully attempted to return because his work activities increased the pain from his work injury. Mr. Ringer further stated that he did not attempt to return to WCI, or for any employer, because the pain from his work injury

---

[10] Because more than forty-five weeks have transpired since the date of maximum medical improvement, Mr. Ringer's initial-tier permanent partial disability benefits have accrued. He is thus entitled to a lump-sum payment of $11,707.20 in compensation for this portion of his award.

8

precludes him from working.[11] WCI argued that Mr. Ringer's failure to return to work after the expiration of his FMLA leave constituted a voluntary resignation of his job. Accordingly, it contends section 50-6-207(3)(D)(i) (2015) prohibits him from receiving an increase of his initial-tier permanent partial disability benefits.

In *Dennis v. Polymer Components,* No. 2015-01-0184, TN Wrk. Comp. App. Bd. LEXIS 47, at *9 (Tenn. Workers' Comp. App. Bd. Sept. 27, 2016),[12] the Workers' Compensation Appeals Board cited the opinion of a Special Workers' Compensation Appeals Panel in *Newton v. Scott Health Care Ctr.,* 914 S.W.2d 884, 886 (Tenn. Workers' Comp. Panel 1995), in observing that the issue of whether an employee made a return to work for workers' compensation purposes "will be leavened by an assessment of the reasonableness of the employer in attempting to return the employee to work and the reasonableness of the employee in failing to return to work."

The Court finds that the preponderance of the evidence in this claim established that Mr. Ringer failed to return to work at WCI, or for another employer, due to the residual pain from his injury, as opposed to personal, non-injury related reasons. In support of this finding, the Court notes that the Wage Statement filed by WCI (Ex. 6) indicates Mr. Ringer worked regularly at WCI during the year preceding the date of injury. Additionally, Mr. Ringer's supervisor at WCI testified Mr. Ringer was a reliable employee before the date of injury and agreed on cross-examination that he had said of Mr. Ringer, "I wish I had ten like him."[13]

In further support of the Court's finding that Mr. Ringer failed to return to work at WCI due to residual pain from his work injury, the medical evidence also shows that Mr. Ringer suffers from a clearly-documented large herniated cervical disk which causes verified radicular symptoms in his left upper extremity. The Court finds that this diagnosis lends credibility to Mr. Ringer's testimony that he has endured increased pain from his work injury when performing his regular job at WCI and activities such as sweeping and raking leaves. Finally, the Court finds the fact Dr. Smith placed permanent restrictions on Mr. Ringer's activities further corroborates Mr. Ringer's testimony on this issue. (Ex. 2 at 10.)

---

[11] The Court notes that Dr. Smith recorded a work history from Mr. Ringer indicating that on and before he injured his neck at WCI, Mr. Ringer had a second job working as a mental health technician. Dr. Smith's note indicates that Mr. Ringer reported he discontinued this job in July 2015 because sitting during the requisite twelve-hour shift increased his neck pain. (Ex. 2 at 8.)

[12] The Court is aware that the *Dennis* opinion considered temporary disability benefits. However, the Appeals Board noted in *Dennis* the concept of a meaningful return to work "is more fully developed in the context of disputes concerning awards of permanent disability benefits, but courts use a similar analytical framework to determine whether an employee is entitled to temporary partial disability benefits in the face of an offer of light duty work." *Dennis,* at *11. Accordingly, the Court properly relies here on the principles discussed in *Dennis.*

[13] The supervisor also testified Mr. Ringer's mental attitude changed before the date of injury, but confirmed his job performance did not suffer despite the change in attitude.

The fact Dr. Jolley released Mr. Ringer to return to work without restrictions in September 2015 does not convince the Court Mr. Ringer would not experience pain when he attempted activities that aggravated the herniated disk in his cervical spine. A review of Dr. Jolley's testimony and notes indicates he lifted Mr. Ringer's restrictions because the FCE examiner failed to assess permanent restrictions due to an allegation of Mr. Ringer's submaximal effort in performing the physical activity undertaken during the testing protocol. The Court finds the fact the examiner deemed Mr. Ringer's FCE unreliable does not, in and of itself, indicate Mr. Ringer is fit to perform the physical activity of a full-time job without restriction.

The Court further finds that Dr. Jolley accepted the FCE determination without personally examining or even talking to Mr. Ringer about the results. While the FCE examiner note unreliable results, a review of the FCE report indicates Mr. Ringer reported increased neck and left upper extremity pain while performing the physical activity required of him to participate in the FCE. (Ex. 5 at ex. 5, pp. 2-3.) Because Dr. Jolley simply returned Mr. Ringer to work without restrictions, despite knowing that Mr. Ringer still had a large herniated cervical disk for which Dr. Jolley himself continued to recommend surgery, the Court gives little weight to Dr. Jolley's assessment that Mr. Ringer was able to return to work without restrictions in September 2015.

Having found that Mr. Ringer failed to return to work at WCI or another employer because of pain from his compensable injury, the Court finds he is entitled to increased permanent partial disability benefits pursuant to section 50-6-207(3)(B) (2015). The Court also awards Mr. Ringer increased benefits because he was over the age of forty on the date the initial compensation period expired.[14] *Id.* After application of the statutory multipliers designated for the pertinent factors, the Court awards Mr. Ringer $18,965.66 in permanent partial disability benefits.

*Additional Temporary Disability Benefits*

Mr. Ringer contended the Court should award him additional temporary disability benefits for periods he did not work after September 14, 2015, when Dr. Jolley wrongfully returned him to work without restrictions. WCI argued that the preponderance of evidence indicates Mr. Ringer attained maximum medical improvement from his injury on September 14, thus, by law, obviating his entitlement to any further temporary disability benefits. The Court agrees with WCI's position on this point.

In *Jones v. Crencor Sales and Leasing,* No. 2015-06-0332, 2015 TN Wrk. Comp. App. Bd. 48, at *7 (Tenn. Workers' Comp. App. Bd. Dec. 11, 2015), the Appeals Board

---

[14] The Court will not award Mr. Ringer increased benefits for lacking a high school diploma or general equivalency diploma because he falsely stated he had a high school diploma on the resume he submitted to WCI when he sought employment there.

10

held that "temporary disability benefits terminate either by the ability to return to work or attainment of maximum medical recovery." Such a finding is implicit in the requirement found in sections 50-6-207(1)(D) and 207(2)(C) (2015) that an employer receives a credit against an employee's permanent disability award for temporary disability benefits paid after the date of maximum medical improvement.

A review of Dr. Smith's report indicates he neither set a date of the maximum medical improvement of Mr. Ringer's injury nor disputed Dr. Jolley's opinion that Mr. Ringer attained maximum medical improvement on September 14, 2015. Accordingly, the Court finds the preponderance of the evidence supports a finding that Mr. Ringer attained maximum medical improvement on September 14, 2015, and, as such, holds that Mr. Ringer is not entitled to the additional temporary disability benefits he requested.

*Change of Treating Physician*

In *McCord v. Advantage Human Resourcing,* 2014-06-0063, 2015 TN Wrk. Comp. App. Bd. 6, at *13 (Tenn. Workers' Comp. App. Bd. March 27, 2015), the Appeals Court approvingly referenced the Supreme Court's decision in *Lindsey v. Strohs Companies,* 830 S.W.2d 899 (Tenn. 1992), that the employer and the employee bear concomitant duties with respect to authorized medical treatment. The employer has a duty to furnish medical and surgical treatment reasonably necessary to treat a work-related injury, while the injured employee has a corresponding duty to accept the medical benefits provided by the employer.

Mr. Ringer asked the Court to order WCI to provide him another panel from which to select a physician to replace Dr. Jolley as his authorized treating physician. He requested a physician who will consider treatment options other than the surgery Dr. Jolley recommends. He also cited a lack of confidence in Dr. Jolley and asks why he should have confidence in a physician who refused to give his deposition in the same room occupied by his own patient.[15]

Mr. Ringer cited to no authority, nor does the Court know of any such authority, supporting his position the Court should order a new panel because the he has lost confidence in Dr. Jolley. Additionally, Mr. Ringer produced no medical evidence challenging the medical sufficiency of Dr. Jolley's treatment decisions. Accordingly, the Court denies Mr. Ringer's request for a new panel.

**IT IS, THEREFORE, ORDERED** as follows:

1. Mr. Ringer is awarded $18,965.66 in permanent partial disability benefits;

---

[15] According to Mr. Ringer's counsel, Dr. Jolley's initial refusal to give his deposition testimony in a room also occupied by Mr. Ringer consumed a sizeable portion of the hour Dr. Jolley allotted for his deposition.

2. Mr. Ringer's requests for additional temporary disability benefits and for a new panel are denied;

3. Costs of this cause of $150.00 are assessed against WCI pursuant to Tennessee Compilation Rules and Regulations 0800-02-21-.07 (2015), to be paid within five days of this order becoming final; and,

4. WCI shall prepare and file a statistical data form within ten business days of the date of this order, pursuant to Tennessee Code Annotated section 50-6-244 (2015).

**ENTERED this the 4th day of November, 2016.**

_____
**Thomas Wyatt**
**Workers' Compensation Judge**

Right to Appeal:

Tennessee Law allows any party who disagrees with this Compensation Hearing Order to appeal the decision to the Workers' Compensation Appeals Board or the Tennessee Supreme Court. To appeal your case to the Workers' Compensation Appeals Board, you must:

1. Complete the enclosed form entitled: "Compensation Hearing Notice of Appeal."

2. File the completed form with the Court Clerk *within thirty calendar days* of the date the Workers' Compensation Judge entered the Compensation Hearing Order.

3. Serve a copy of the Compensation Hearing Notice of Appeal upon the opposing party.

4. The appealing party is responsible for payment of a **filing fee in the amount of $75.00.** Within ten calendar days after the filing of a notice of appeal, payment must be received by check, money order, or credit card payment. Payments can be made in person at any Bureau office or by United States mail, hand-delivery, or other delivery service. In the alternative, the appealing party may file an Affidavit of Indigency, on a form prescribed by the Bureau, seeking a waiver of the filing fee. The Affidavit of Indigency may be filed contemporaneously with the Notice of Appeal or must be filed within ten calendar days thereafter. The Appeals Board will consider the Affidavit of Indigency and issue an Order granting or denying

the request for a waiver of the filing fee as soon thereafter as is practicable. **Failure to timely pay the filing fee or file the Affidavit of Indigency in accordance with this section shall result in dismissal of the appeal.**

5. The party filing the notice of appeal, having the responsibility of ensuring a complete record on appeal, may request, from the Court Clerk, the audio recording of the hearing for the purpose of having a transcript prepared by a licensed court reporter and filing it with the Court Clerk within fifteen calendar days of the filing of the Compensation Hearing Notice of Appeal. Alternatively, the party filing the appeal may file a joint statement of the evidence within fifteen calendar days of the filing of the Compensation Hearing Notice of Appeal. The statement of the evidence must convey a complete and accurate account of what transpired in the Court of Workers' Compensation Claims and must be approved by the workers' compensation judge before the record is submitted to the Clerk of the Appeals Board. *See* Tenn. Comp. R. & Regs. 0800-02-22-.03 (2015).

6. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Workers' Compensation Appeals Board, the appeal will be docketed and assigned to an Appeals Board Judge for review. At that time, a docketing notice shall be sent to the parties. Thereafter, the parties have fifteen calendar days to submit briefs to the Appeals Board for consideration. *See* Tenn. Comp. R. & Regs. 0800-02-22-.02(3) (2015).

**To appeal your case directly to the Tennessee Supreme Court, the Compensation Order must be final and you must comply with the Tennessee Rules of Appellate Procedure. If neither party timely files an appeal with the Appeals Board, this Order will become final by operation of law thirty calendar days after entry pursuant to Tennessee Code Annotated section 50-6-239(c)(7).**

13

## APPENDIX

Technical record:

The Court considered the following items filed with the Clerk in considering this claim:

1. Petition for Benefit Determination, filed February 16, 2016;
2. Initial Dispute Certification Notice, filed May 10, 2016;
3. Joint Pre-Compensation Hearing Statement, filed October 5, 2016; and
4. Post-Discovery Dispute Certification Notice, filed October 17, 2016.

The Court did not consider attachments to Technical Record filings unless admitted into evidence during the Compensation Hearing. The Court considered factual statements in these filings or any attachments to them as allegations unless established by the evidence.

Exhibits:

The Court admitted into evidence the following exhibits:

1. Personnel File maintained by WCI;
2. Report of Dr. Jerry Smith;
3. Agreement Between Employee/Employer Choice of Physician (C-42);
4. Transcript of Deposition of Lamar Ringer;
5. Transcript of Deposition of Dr. Jay E. Jolley, II;
6. Wage Statement (C-41); and
7. First Report of Work Injury.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Compensation Hearing Order was sent to the following recipients by the following methods of service on this the 4th day of November, 2016.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|------|---------|------|--------|-----------------|
| Russell King, Esq., Employee's Attorney | | | X | russell@rtking.com |
| Fred Baker, Esq., Employer's Attorney | | | X | Fbaker@wimberlylawson.com |

PENNY SHRUM, COURT CLERK
wc.courtclerk@tn.gov

15